**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| TURNER CONSTRUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No.  1:17-cv-799 (LMB/IDD) |
| | ) | |
| WASHINGTON METROPOLITAN | ) | |
| AREA TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |
| ———————————————————— | ) | |
| | ) | |
| WASHINGTON METROPOLITAN | ) | |
| AREA TRANSIT AUTHORITY, | ) | |
| 600 Fifth Street, NW | ) | |
| Washington, DC 20001, | ) | |
| | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ISKALO CBR LLC, | ) | |
| 5166 Main Street | ) | |
| Williamsville, NY 14221, | ) | |
| | ) | |
| SERVE: | ) | |
| Registered Agent: Corporate Creations | ) | |
| Network Inc. | ) | |
| 6802 Paragon Place #410 | ) | |
| Richmond, VA 23230 | ) | |
| | ) | |
| Third Party Defendant. | ) | |
| ———————————————————— | ) | |

## ANSWER, COUNTERCLAIM, AND THIRD-PARTY COMPLAINT

Defendant Washington Metropolitan Area Transit Authority ("WMATA" or "Defendant"),

by counsel, hereby answers the Complaint filed by Plaintiff Turner Construction Company

("Plaintiff" or "Turner").  Defendant denies each and every allegation, whether express or implied, contained in the Complaint not specifically admitted herein.

Defendant answers and responds to the specific numbered Paragraphs as follows:

## RESPONSES TO NUMBERED PARAGRAPHS

1.       **This is an action for breach of contract arising out of WMATA's failure to compensate Turner for permitting delays that were outside of Turner's control and WMATA's failure to issue a change order for Turner's providing a dedicated change order engineer as a result of those delays.**

Defendant denies the allegations contained in Paragraph 1 of the Complaint, except admits only that Turner has filed this action.  WMATA specifically denies that delays on this project "were outside of Turner's control" and that WMATA "failed to issue a change order for Turner's providing a dedicated change order engineer as a result of those delays."

2.       **Turner is a construction company incorporated in New York with its principal office in New York, New York.**

Defendant admits only that Plaintiff provides construction services.  Defendant is without sufficient information to either admit or deny the remaining allegations of Paragraph 2 of the Complaint, and therefore they are denied.

3.       **WMATA is an agency under the jurisdiction of the District of Columbia, Virginia, and Maryland, with its principal office in the District of Columbia.**

Defendant denies the allegations as phrased in Paragraph 3 of the Complaint, except admits only that WMATA is an interstate compact agency and instrumentality of the District of Columbia, State of Maryland and Commonwealth of Virginia, having its principal office at 600 Fifth Street, NW, Washington, DC 20001 ("WMATA").

**4.    This Court has jurisdiction over this action pursuant 28 U.S.C. § 1331, because Congress has consented to the WMATA Compact of 1966, Va. Code § 33.2-3100.  Pub. L. No. 86-794 (74 Stat. 1031, as amended by 76 Stat. 764).**

In response to the allegations contained in Paragraph 4 of this Complaint, Defendant admits

that this Court has jurisdiction over this action.

**5.    Paragraph 81 of the WMATA Compact of 1966 states that "[t]he United States District courts shall have original jurisdiction, concurrent with the courts of Maryland, Virginia and the District of Columbia, of all actions brought by or against the Authority."**

Defendant admits that the language quoted in the allegations of Paragraph 5 of the

Complaint is from Paragraph 81 of the WMATA Compact of 1966 and asserts that the language

of that document speaks for itself.

**6.    Venue is proper in this judicial district under section 6.1 of the Design-Build and Construction Coordination Agreement between Turner and WMATA, which states that "[t]he sole and exclusive venue for any lawsuit arising out of or relating to this Agreement shall be the Circuit Court of Fairfax County or the United States District Court for the Eastern District of Virginia."**

In response to the allegations of Paragraph 6 of the Complaint, Defendant admits that venue

is proper in this Court.

**7.    Venue is also proper under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.**

In response to the allegations of Paragraph 7 of the Complaint, Defendant admits that venue

is proper in this Court.  WMATA denies any factual allegations contained in Paragraph 7 of the

Complaint.

**8.    In July 2009, WMATA designated Iskalo CBR LLC ("Developer") as the developer for real property located at 7901 Cinder Bed Road, in Fairfax County, Virginia ("Site").**

Defendant denies the allegations as phrased in Paragraph 8 of the Complaint, except

admits only that in July 2009, WMATA and Iskalo CBR LLC entered a Developer Designation

whereby Iskalo CBR LLC was identified as the developer for the property then identified as "an

approximately 17.4-acre parcel of real property known as 7820 Cinder Bed Road," and now identified as 7901 Cinder Bed Road, in Fairfax County, Virginia (the "Site").

9.      **On April 28, 2010, WMATA and the Developer entered into a Master Development Agreement ("MDA") for the design, development and construction of the Cinder Bed Road Bus Operations and Maintenance Facility (the "Project") at the Site.**

Defendant denies the allegations as phrased in Paragraph 9 of the Complaint, except admits only that on or about April 28, 2010, WMATA executed a Master Development Agreement ("MDA") which provided for, among other things, the design, development and construction of the Cinder Bed Road Bus Operations and Maintenance Facility (the "Project") at the Site.

10.     **On September 13, 2013, Turner submitted a Guaranteed Maximum Price Technical Proposal ("GMP Proposal") to WMATA for the Project, which was amended October 10, 2013.**

Defendant admits the allegations of Paragraph 10 of the Complaint.

11.     **On October 25, 2013, Turner and WMATA entered into a "Design-Build and Construction Coordination Agreement" ("DBA") for the Project.   WMATA officially awarded the contract to Turner on October 28, 2013.**

Defendant admits the allegations of Paragraph 11 of the Complaint.

12.     **The DBA Contract Documents consist of:**

> **1.1.1  The MDA dated April 28, 2010 between Washington Metropolitan Area Transit Authority and Iskalo CBR LLC[;]**
>
> **1.1.2  the Project Manual for the Cinder Bed Road Bus Operations and Maintenance Facility, all amendments thereto, and documents referenced [in] or attached to the Project Manual (collectively the "Project Manual"). The Project Manual is annexed hereto as Exhibit A; and**
>
> **1.1.3  this Agreement and all amendments thereto, and documents referenced [in] or attached to it.**

**DBA, § 1.1.**

Defendant admits that the language quoted in the allegations of Paragraph 12 of the Complaint is from Section 1.1 of the Design-Build and Construction Coordination Agreement

4

("DBA") and asserts that the language of that document speaks for itself.  Defendant denies any

remaining factual allegations contained in Paragraph 12.

13.     **The DBA references the GMP proposal at page one and states, in relevant part: "Design-Builder has . . . submitted a Guaranteed Maximum Price Proposal offering to design and construct the Project in strict accordance with the provisions of the Project Manual in consideration of the Guaranteed Maximum Price as provided in this Agreement. The Authority wishes to accept that Proposal." DBA at 1. Thus, Turner's GMP proposal is included in the definition of Contract Documents.**

Defendant admits that the DBA contains the language quoted in Paragraph 13 of the

Complaint and asserts the language of that document speaks for itself.  Defendant denies any

remaining factual allegations contained in Paragraph 13.

14.     **This Complaint refers to the DBA, MDA, Project Manual, and GMP collectively as the "Contract."**

Defendant asserts that the allegations contained in Paragraph 14 of the Complaint do not

require a response, but to the extent a response is required, the allegations are denied.

15.     **The Project Manual requires WMATA to issue an equitable adjustment for any change that increases the cost or time of performance:**

**D. If any change under this Section causes an increase or decrease in the DesignBuilder's cost of, or the time required for, the performance of any part of the work under this Contract, whether or not changed by any order, an equitable adjustment shall be made and the Contract modified in writing accordingly[.]**

**Project Manual, § 00753(D).**

Defendant admits that the Project Manual § 00753(D) contains the language quoted in

Paragraph 15 of the Complaint and asserts that the language of that document speaks for itself.

Defendant denies all other allegations contained in Paragraph 15 of the Complaint, including that

the Project Manual provides "that any change that increases the cost or time of performance"

"requires WMATA to issue an equitable adjustment."

16.     **Turner's GMP Proposal states, "[t]he GMP <u>excludes</u> any cost or time associated with permitting delays that are outside the control of Turner." GMP Proposal, Bid Proposal Assumptions and Clarifications, ¶ 29 (emphasis added).  Thus, contractually, Turner had no responsibility for permit delays outside of its control.**

Defendant admits that the Guaranteed Maximum Price Technical Proposal ("GMP Proposal") contains the language quoted in Paragraph 16 of the Complaint and asserts that the language of that document speaks for itself.  With respect to the remaining allegations contained in Paragraph 16, these allegations are conclusions of law to which an answer is not required, but to the extent the allegations are considered factual in nature, the allegations are denied.

17.     **The site plan approval ("SPA") was a prerequisite to obtaining the required Land Disturbance and Storm Water permit from Fairfax County, Virginia.  The rough grading plan ("RGP") represents a portion of the SPA.  The RGP is a partial site plan.  All aspects of the RGP are part of the SPA.**

Defendant admits that the site plan application is a prerequisite to obtaining further permits from Fairfax County, Virginia, but denies that a Site Plan Approval ("SPA") is a mandatory prerequisite for a Land Disturbance Permit or a Stormwater Permit.   Defendant denies the remainder of Paragraph 17 of the Complaint.

18.     **The MDA states that the Developer is responsible for obtaining the SPA:**

**Developer will (or will cause appropriate Project Team members [to]) prepare, file and process, with the approval and cooperation of WMATA (which approval shall not be unreasonably withheld, conditioned or delayed), applications for the Approvals and attend and present the Project at public hearings and other meetings relating to the approvals. . . .  As part of its Pre-Acquisition Services, Developer shall perform all necessary underlying studies and surveys related to the Approvals. With the consent of WMATA, <u>Developer, as soon as practicable after filing of the</u> <u>applications for Special Exception Permits, shall also seek permission for</u> <u>concurrent processing of the Site Plan Approval application and subsequently file</u> <u>same upon its completion so as to expedite procurement of Site Plan Approval</u>. WMATA acknowledges and accepts that concurrent processing of the Site Plan application may not result in procurement of Site Plan Approval prior**

**to the Outside Date and is therefore, not a pre-condition to WMATA's closing on the acquisition of the Site.**

**MDA, § 3.2(b) (emphasis added).**

Defendant denies the allegations as phrased in Paragraph 18 of the Complaint, except admits only that the language contained in Paragraph 18 is a partial quote from the MDA and asserts that the language of that document speaks for itself.

19.     **The DBA states that the duties of the Developer include obtaining the SPA:**

**1.5     Duties of the Developer**
**In furtherance of its duties under the MDA, Developer shall perform the obligations described below.**

**\* \* \***

**1.5.3 <u>Site Plan Approval</u> - Developer shall direct all activities necessary for application and procurement of Site Plan Approval from Fairfax County for the Project, including procurement of any necessary variances.**

**DBA, § 1.5.3.**

Defendant denies the allegations as phrased in Paragraph 19 of the Complaint, except admits only that the language contained in Paragraph 19 is a partial quote from the DBA and asserts that the language of that document speaks for itself.

20.     **Exhibit G attached to the Second Amendment to the MDA (dated December 17, 2010) states that the MDA budget includes $321,977 for "Site Plan Approval."**

Defendant denies the allegations as phrased in Paragraph 20 of the Complaint, except admits only that Exhibit G to the Second Amendment to the MDA (dated December 17, 2010) provides a line item for "Site Plan Approval" in the amount of $321,977, but asserts that the language of that document speaks for itself.

21.     **Turner could not begin its work as planned until the SPA was obtained. Turner's plan of construction was based on receiving the SPA by December 6, 2013.**

Defendant denies the allegations contained in the first sentence of Paragraph 21 of the Complaint.  Defendant is without sufficient information to either admit or deny the allegations contained in the second sentence of Paragraph 21 of the Complaint, and therefore they are denied.

22.     **The contract schedule in Turner's GMP Proposal included a milestone date of December 6, 2013 for the SPA.**

Defendant denies the allegations contained in Paragraph 22 of the Complaint.

23.     **For reasons outside of Turner's control, the SPA was not obtained by December 6, 2013 and caused protracted delays to Turner's work.**

Defendant denies the allegations contained in Paragraph 23 of the Complaint.

24.     **To mitigate the SPA delay and begin some of its work, Turner applied for the RGP so that it could perform limited erosion and sediment controls, tree preservation/removal, and storm water bypass work.  The RGP would not have been necessary if the Developer had timely obtained the SPA.  The Contract did not require Turner to obtain the RGP.**

Defendant is without sufficient information to either admit or deny the allegations contained in the first sentence or the second sentence of Paragraph 24 of the Complaint, and therefore they are denied.  Defendant denies the allegations contained in the third sentence of Paragraph 24 of the Complaint.

25.     **On January 24, 2014, Fairfax County approved the RGP, contingent on WMATA signing a conservation agreement and providing a letter of credit.**

Defendant denies the allegations as phrased in Paragraph 25 of the Complaint, except admits that Fairfax County approved the Rough Grading Plan ("RGP") on or about January 24, 2014, but withheld release of the RGP pending receipt of a signed conservation agreement and letter of credit.

26.     **On March 10, 2014, Turner notified WMATA via letter that WMATA was delaying the RGP approval process by failing to sign the conservation agreement and to provide the letter of credit, and stated, in relevant part:**

> **Turner is continuing to experience delays in the permitting process, specifically in regards to the release of the [RGP] which is pending the Conservation Agreement being signed by WMATA as well as the necessary letter of credit that is required. This delay is directly impacting the critical path in that we cannot start work without release of the [RGP].**

Defendant denies the allegations contained in Paragraph 26 of the Complaint, except admits only that on or about March 10, 2014, Turner sent a letter to WMATA containing the language quoted in Paragraph 26 and asserts that the language of that document speaks for itself.

27.     **On May 19, 2014, WMATA signed the conservation agreement and Turner was able to begin limited erosion and sediment controls, tree preservation/removal, and storm water bypass work under the RGP.**

Defendant denies the allegations contained in Paragraph 27 of the Complaint, except admits only that on or about May 19, 2014, it signed the conservation agreement.

28.     **On July 11, 2014, Fairfax County established new requirements for the RGP and withdrew its January 24, 2014 approval of the RGP**.

Defendant denies the allegations contained in Paragraph 28 of the Complaint, except admits only that Fairfax County reversed approval of the RGP on or about July 11, 2014.

29.     **On October 1, 2014, because there was still no SPA, Turner could not perform any further work, and Turner was forced to demobilize.**

Defendant denies the allegations contained in Paragraph 29 of the Complaint, except admits only that as of October 1, 2014, Turner and Developer had failed to obtain the SPA.

30.     **Although the Contract did not require Turner to re-submit the RGP, Turner resubmitted the RGP so that it could progress and mitigate delays caused by the Developer's failure to obtain the SPA.  On October 23, 2014, Fairfax County approved a revised RGP and this approved RGP enabled Turner to mitigate the lack of the SPA and to begin submitting plans for the retaining walls for the required permits from Fairfax County.**

Defendant denies the allegations contained in Paragraph 30 of the Complaint, except admits only that "[o]n October 23, 2014, Fairfax County approved a revised RGP."

9

31.     **On May 20, 2015, rather than the December 6, 2013 date in the GMP contract schedule, the Developer obtained the final SPA from Fairfax County, Virginia.**

Defendant denies the allegations contained in Paragraph 31 of the Complaint, except admits only that on or about May 20, 2015, the final SPA was obtained from Fairfax County, Virginia.

32.     **The RGP and SPA delays were outside of Turner's control.**

Defendant denies the allegations contained in Paragraph 32 of the Complaint.

33.     **The RGP and SPA delays caused 401 days of critical path delay to the completion of Turner's DBA, for which Turner is entitled to an equitable adjustment and/or breach of contract damages.**

Defendant denies the allegations contained in Paragraph 33 of the Complaint, except admits only that there were delays caused by Turner.

34.     **WMATA issued change orders to compensate subcontractors for direct costs and delay costs that the RGP and SPA delays caused Turner and its subcontractors. The issuance of these change orders by WMATA constituted an admission of liability by WMATA to pay Turner for the RGP and SPA delays.**

Defendant denies the allegations contained in Paragraph 34 of the Complaint, except admits only that it issued certain change orders to compensate certain subcontractors for costs experienced by those subcontractors related to the delay of the RGP and SPA and asserts that those change orders speak for themselves.   WMATA specifically denies that such change orders constitute an admission of liability by WMATA to Turner or any other party with respect to the SPA and RGP delays; to the contrary, WMATA specifically disclaimed such liability.

35.     **On June 14, 2016, WMATA issued Unilateral Prime Contract Modification No. 008, Part 1 in the amount of $137,487 "to compensate subcontractors . . . for the agreed costs relating to Fairfax County's scope of work changes during the Rough Grading Permitting process." WMATA signed this modification on June 15, 2016.**

Defendant denies the allegations contained in Paragraph 35 of the Complaint, except admits only that: (1) it issued Unilateral Contract Modification No. 8, Part 1 in the amount of

$137,487 on or about June 14, 2016; (2) the quoted language contained in Paragraph 35 is a partial

quote from Modification No. 8, Part 1; and (3) the language of that document speaks for itself.

Defendant specifically denies that Modification No. 8, Part 1 constitutes an admission of liability

by WMATA to Turner or any other party with respect to the SPA and RGP delays.

**36.      On October 28, 2016, WMATA issued Prime Contract Modification No. 008, Part 1A in the amount of $490,456 "to compensate the impacted subcontractors for the direct costs, markups and overhead included in the final agreed amount . . . relating to Fairfax County's scope of work changes during the Rough Grading Permitting (Turner's PCOs 025 & 039) and Site Plan (Turner's PCO 029) process."  Turner signed this modification on November 17, 2016, and WMATA signed this modification on November 21, 2016.**

Defendant denies the allegations contained in Paragraph 36 of the Complaint, except

admits only that: (1) it issued Unilateral Contract Modification No. 8, Part 1A in the amount of

$490,456 on or about June 14, 2016; (2) the parties signed this document on the dates alleged; and

(3) the quoted language contained in Paragraph 36 is a partial quote from Modification No. 8, Part

1A and speaks for itself.  Defendant denies that Modification No. 8, Part 1A constitutes an

admission of liability by WMATA to Turner or any other party with respect to the SPA and RGP

delays.

**37.      On March 16, 2017, WMATA issued Prime Contract Modification No. 015, Part 1 in the amount of $574,113 "to pay some subcontractor direct costs relating to Turner's PCO 038, Request for Equitable Adjustment, for Site Plan Permit Delays."  Turner signed this modification on March 17, 2017, and WMATA signed this modification on March 24, 2017.**

Defendant denies the allegations contained in Paragraph 37 of the Complaint, except

admits only that: (1) it issued Unilateral Contract Modification No. 15, Part 1 in the amount of

$574,113 on or about March 16, 2017; (2) the parties signed this document on the dates alleged;

and (3) the quoted language contained in Paragraph 35 of the Complaint is a partial quote from

Modification No. 15 and speaks for itself.  Defendant denies that Modification No. 15 constitutes

an admission of liability by WMATA to Turner or any other party with respect to the SPA and

11

RGP delays.  Indeed, Modification No. 15 includes the following language: "WMATA's review of Turner's PCO 038 Request for Equitable Adjustment is ongoing, and WMATA's equitable adjustment payments of these amounts to Turner's subcontractors is not an admission of contractual responsibility or culpability under PCO 038."

38.    **Even though WMATA recognized Turner's entitlement to be paid for the RGP and SPA delays by issuing change orders compensating subcontractors for those delays, WMATA refused to provide an equitable adjustment to Turner for the RGP and SPA delays.**

In response to the allegations contained in Paragraph 38 of the Complaint, Defendant denies that Turner is entitled to an equitable adjustment for RGP and SPA delays, and to the extent there are any additional factual allegations contained in paragraph 38, they are denied.

39.    **On June 21, 2016, Turner submitted a request for equitable adjustment ("REA") under Proposed Change Order ("PCO") No. 038 seeking an increase in the GMP and a 401-day extension in the contract time for the RGP and SPA delays.**

Defendant admits the allegations of Paragraph 39 of the Complaint, except specifically denies that Turner is entitled to an equitable adjustment.

40.    **On July 11, 2016, while the REA was pending, Turner and WMATA participated in a hearing before a Disputes Review Board ("DRB") pursuant to section 01260 of the Project Manual.**

Defendant admits the allegations of Paragraph 40 of the Complaint.

41.    **On July 11, 2016, the DRB orally ruled that it was not Turner's responsibility to obtain the SPA.**

Defendant denies the allegations contained in Paragraph 41 of the Complaint, and WMATA specifically denies that there was any binding "rul[ing]" whatsoever.

42.    **In a letter dated July 13, 2016, Turner confirmed the DRB decision and proposed to WMATA a path forward for resolving the REA.**

Defendant denies the allegations contained in Paragraph 42 of the Complaint, except admits only that Turner sent a letter to WMATA on July 13, 2016 which speaks for itself.

43.     **In a letter dated September 2, 2016, WMATA notified the Developer of Turner's REA and acknowledged that the Developer, and not Turner, was responsible for obtaining SPA.  That letter stated, in relevant part:**

> **It is Turner's position that the current delays to the project completion were directly caused by the late acquisition of the Site Plan Approval (SPA) for which it bears no responsibility.  Be advised that a Disputes Review Board (DRB) established by the contract agrees with Turner in its July 11, 2016 ruling.  The DRB ruled that based upon duties as assigned in both the MDA and the [DBA] that Turner was not responsible for obtaining the Site Plan Approval.**

> **The Authority plans to initiate negotiation meetings with Turner in Washington DC during the week of September 12, 2016.  Iskalo is invited to be present as these negotiation meetings proceed, <u>since it is believed that based upon duties as assigned in both the MDA and the [DBA] that Iskalo, as the responsible party for the acquisition of the SPA, is also responsible for delays related to the SPA</u>.**

**(Emphasis added).  This letter constituted an admission by WMATA that Turner was entitled to be paid for the RGP and SPA delays.**

Defendant denies the allegations contained in Paragraph 43 of the Complaint, except admits that: (1) it sent a letter to the Developer dated September 2, 2016 and the language quoted in Paragraph 43 is contained in that letter; and (2) the language of that letter speaks for itself. Defendant specifically denies that: (1) the quoted language is the "relevant" language of the letter; (2) the letter constituted any kind of admission regarding Turner's alleged entitlement; and (3) the letter provided that Iskalo CBR LLC and not Turner was responsible for obtaining the SPA, when in fact both the Developer and Turner were responsible for obtaining the SPA.

44.     **However, on February 24, 2017, WMATA issued a letter with findings relating to REA No. 038, stating that "WMATA is not liable for any delays resulting from the Site Plan approval process and therefore Contractor's claim has no merit."**

Defendant denies the allegations contained in Paragraph 44 of the Complaint, except admits that: (1) it sent a letter to Turner dated February 24, 2017 regarding WMATA's response to Request for Equitable Adjustment ("REA") No. 38 and the language quoted in Paragraph 44 is contained in the letter; and (2) the language of the letter speaks for itself.

13

45.     **On April 20, 2017, Turner and WMATA met to discuss the RGP and SPA delays and WMATA refused to change its position that Turner was not entitled to compensation.**

Defendant admits the allegations contained in Paragraph 45 of the Complaint.

46.     **On May 19, 2017, Turner sent a letter to WMATA restating its entitlement to be paid for the REA.**

Defendant denies the allegations contained in Paragraph 46 of the Complaint, except admits only that Turner sent a letter to WMATA dated May 19, 2017 and that the language of the letter speaks for itself.

47.     **On June 29, 2017, WMATA issued a final decision denying REA PCO No. 038.**

Defendant admits the allegations contained in Paragraph 47 of the Complaint.

48.     **On October 5, 2016, Turner notified WMATA that it was providing a dedicated change order engineer to handle the change orders that the RGP and SPA delays necessitated.**

Defendant denies the allegations contained in Paragraph 48 of the Complaint, except admits that on or about October 5, 2016, Turner sent Letter No. L-122 to WMATA and that the language of that document speaks for itself.

49.     **On October 21, 2016, Turner submitted PCO No. 144 notifying WMATA of $180,000 as an estimate for the costs for providing the change order engineer for four to six months.**

Defendant denies the allegations contained in Paragraph 49 of the Complaint, except admits only that on or about October 21, 2016, Turner sent PCO No. 144 to WMATA and that the language of that document speaks for itself.

14

50.   **On June 15, 2017, WMATA sent a letter from the contracting officer stating that it would issue a change order for PCO No. 144 by June 30, 2017 to pay for these costs. WMATA did not issue that change order and has breached the contract by failing to do so.**

Defendant denies the allegations contained in Paragraph 50 of the Complaint, except admits only that it sent a letter dated June 15, 2017 to Turner and that the language of that document speaks for itself.

<u>**COUNT I**</u>
<u>**(Breach of Contract – RGP and SPA delays)**</u>

51.   **The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.**

Defendant incorporates its responses to the allegations contained in all foregoing paragraphs as if fully set forth herein.

52.   **Turner and WMATA entered into a valid and enforceable Contract, in which WMATA agreed that the "[t]he GMP excludes any cost or time associated with permitting delays that are outside the control of Turner."**

Defendant denies the allegations contained in Paragraph 52 of the Complaint, except admits that: (1) the DBA is a valid and enforceable contract; and (2) the language quoted in Paragraph 52 of the Complaint is from the GMP Proposal and that language speaks for itself.

53.   **The Contract required WMATA to provide an equitable adjustment for any change that increased Turner's cost or time of performance.**

Defendant denies the allegations contained in Paragraph 53 of the Complaint.

54.   **The RGP and SPA delays increased Turner's cost and time of performance.**

Defendant denies the allegations contained in Paragraph 54 of the Complaint.

55.   **The RGP and SPA delays were outside the control of Turner because the Developer was responsible for obtaining the SPA.**

Defendant denies the allegations contained in Paragraph 55 of the Complaint.

56.   **WMATA has admitted that Turner is entitled to recover for these delays by issuing change orders paying in part for delays encountered by Turner's subcontractors, and**

in its September 2, 2016 letter to the Developer.  WMATA has materially breached the Contract by issuing a final decision denying any entitlement for the RGP and SPA delays.

Defendant denies the allegations contained in Paragraph 56 of the Complaint.

57.    As a result of WMATA's material breach, Turner is entitled to recover the amount of $6,514,845 as an equitable adjustment and/or breach of contract damages.

Defendant denies the allegations contained in Paragraph 57 of the Complaint.


## COUNT II
### (Breach of Contract – Administrative Costs for Change Order Engineer)

58.    The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

The Court dismissed this Count by Order dated September 20, 2017.  To the extent a

response is required, Defendant denies the allegations contained in Paragraph 58 of the Complaint.

59.    Turner and WMATA entered into a valid and enforceable Contract, in which WMATA agreed to provide an equitable adjustment for any change that increased Turner's cost or time of performance.

The Court dismissed this Count by Order dated September 20, 2017.  To the extent a response

is required, Defendant denies the allegations contained in Paragraph 59 of the Complaint.

60.    As a direct result of the RGP and SPA delays, Turner was forced to provide a change order engineer to handle change orders that provided compensation for the increased costs that the RGP and SPA delays caused.

The Court dismissed this Count by Order dated September 20, 2017.  To the extent a response

is required, Defendant denies the allegations contained in Paragraph 60 of the Complaint.

61.    WMATA materially breached the Contract by agreeing to pay for such engineer and then by failing to issue a change order to provide an equitable adjustment for the administrative costs of providing a change order engineer.

The Court dismissed this Count by Order dated September 20, 2017.  To the extent a response

is required, Defendant denies the allegations contained in Paragraph 61 of the Complaint.

62. **As a result of WMATA's material breach, Turner is entitled to recover the amount of $143,494.**

The Court dismissed this Count by Order dated September 20, 2017. To the extent a response is required, Defendant denies the allegations contained in Paragraph 62 of the Complaint.

## GENERAL DENIAL

63. Defendant denies each and every allegation of the Complaint not expressly admitted in this Answer.

64. In response to the prayers for relief, Defendant denies that Plaintiff is entitled to the relief requested in the Complaint or to any other relief.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief may be granted. By contract, Turner was responsible for obtaining the SPA and cannot now claim that it was not. The Contract does not provide for additional costs due to changes that were not caused by WMATA.

### Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, for failure to mitigate alleged damages and by Plaintiff's own conduct. Turner failed to pursue all of its available options and strategies for obtaining the SPA and failed to pursue strategies that would have allowed Turner to proceed with construction during the pendency of the final SPA.

**Third Affirmative Defense**

Plaintiff's claims are barred by set-off and/or recoupment, and to the extent that any of the alleged delays are determined to be outside of Turner's control and the responsibility of WMATA, Plaintiff's claims of delay are offset by concurrent delay on the project caused by Turner.

**Fourth Affirmative Defense**

Plaintiff has failed to perform both its express and implied obligations under the alleged agreements.

**Fifth Affirmative Defense**

Plaintiff's claims are barred by the doctrine of unclean hands and/or Turner's own conduct.

**Sixth Affirmative Defense**

Plaintiff's claims are barred by waiver and/or estoppel.

**Seventh Affirmative Defense**

Plaintiff's claims are barred by payment because WMATA has compensated Turner for its work in accordance with the Contract.

**Eighth Affirmative Defense**

Defendant reserves the right to assert additional affirmative defenses that may become known.

* * * * *

WHEREFORE, Defendant Washington Metropolitan Area Transit Authority respectfully requests that this Court dismiss the Complaint in its entirety, and grant such further relief as this Court deems proper.

18

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Counterclaimant Washington Metropolitan Area Transit Authority ("WMATA" or "Counterclaimant" or "Third-Party Plaintiff"), by counsel, files this Counterclaim against Turner Construction Company ("Turner" or "Counterclaim Defendant") and Third-Party Complaint against Iskalo CBR, LLC ("Iskalo" or "Developer" or "Third-Party Defendant").

## PARTIES

1.    WMATA is an interstate compact agency and instrumentality of the District of Columbia, State of Maryland and Commonwealth of Virginia having its principal office at 600 Fifth Street, NW, Washington, DC 20001.

2.    According to the Complaint, Turner is a construction company incorporated in New York with its principal office in New York, New York.

3.    Iskalo is a New York limited liability company with offices at 5166 Main Street, Williamsville, NY 14221.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Congress has consented to the WMATA Compact of 1966, Va. Code § 33.2-3100.  Pub. L. No. 86-794 (74 Stat. 1031, as amended by 76 Stat. 764).

5.    Paragraph 81 of the WMATA Compact of 1966 provides that "[t]he United States District courts shall have original jurisdiction, concurrent with the courts of Maryland, Virginia and the District of Columbia, of all actions brought by or against the Authority."

6.    Venue is proper in this judicial district under section 6.1 of the Design-Build and Construction Coordination Agreement ("DBA") between Iskalo, Turner, and WMATA, which states that "[t]he sole and exclusive venue for any lawsuit arising out of or relating to this

19

Agreement shall be the Circuit Court of Fairfax County or the United States District Court for the Eastern District of Virginia."

7.      Venue is also proper under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

## FACTUAL ALLEGATIONS

### Relevant Agreements

8.      Iskalo, Turner, and Wendel Duchscherer Architecture & Engineering PC ("Wendel") worked together as a team on the design, development and construction of WMATA's Cinder Bed Road Bus Operations and Maintenance Facility (the "Project") located at 7820 Cinder Bed Road, and now identified as 7901 Cinder Bed Road, in Fairfax County, Virginia (the "Site").

9.      On behalf of its team, Iskalo submitted an unsolicited proposal, dated August 18, 2008, to WMATA, pursuant to which Developer offered to provide certain real estate and services for the Project.

10.      On or about April 28, 2010, WMATA and Developer entered into a Master Development Agreement for the development of the Site ("MDA").

11.      On or about October 25, 2013, Developer, Turner and WMATA entered into  the DBA for the design and construction of a new Cinder Bed Road Bus Operations and Maintenance Facility on the Site and related site improvements and amenities.

12.      The DBA provided as follows with respect to the documents that make up the complete contract between the parties.:

1.1.1     The MDA dated April 28, 2010 between Washington Metropolitan Area Transit Authority and Iskalo CBR LLC[;]

1.1.2     the Project Manual for the Cinder Bed Road Bus Operations and Maintenance Facility, all amendments thereto, and documents referenced [in] or attached to the Project Manual (collectively the "Project Manual"). The Project Manual is annexed hereto as Exhibit A; and

20

1.1.3   this Agreement and all amendments thereto, and documents referenced [in] or attached to it.

DBA, § 1.1.  This Counterclaim and Third-Party Complaint refers to the foregoing collectively as the "Contract."

### Iskalo and Turner Were Responsible for Obtaining the Site Plan Approval

13.     Under the MDA, the Developer (not WMATA) was responsible for the "Approvals" related to the Project, which responsibility could be delegated to an "appropriate Project Team member":

> Developer will (or will cause appropriate Project Team members [to]) prepare, file and process, with the approval and cooperation of WMATA (which approval of WMATA shall not be unreasonably withheld, conditioned or delayed), applications for the Approvals and attend and present the Project at public hearings and other meetings relating to the approvals. . . .  As part of its Pre-Acquisition Services, Developer shall perform all necessary underlying studies and surveys related to the Approvals. With the consent of WMATA, Developer, as soon as practicable after filing of the applications for Special Exception Permits, shall also seek permission for concurrent processing of the Site Plan Approval application and subsequently file same upon its completion so as to expedite procurement of Site Plan Approval. WMATA acknowledges and accepts that concurrent processing of the Site Plan application may not result in procurement of Site Plan Approval prior to the Outside Date and is therefore, not a pre-condition to WMATA's closing on the acquisition of the Site.

MDA, § 3.2(b).

14.     The MDA specifically identified the "Project Team" in the MDA to include among others, Iskalo as the Developer, Wendel as the "project engineer of record," and Turner (f/k/a Tompkins Builders, Inc.) as the "design builder."  *Id.* § 3.1(b).

15.     From inception of the Project, Iskalo, Turner and Wendel have been involved as a team in every step of the development of the Project.  This is evidenced by, among other things, each of these parties' participation in the planning meetings for the Project and development of the Site.

16.     The MDA defines "Approvals" as "collectively, the Special Exception Permits, the Site Plan Approval, and any other necessary approvals for the Project from appropriate government agencies, including, without limitation, zoning, land use, environmental, health or other similar approvals." *Id.* § 3.2(f).

17.     The DBA references and acknowledges the MDA as part of the contract.  DBA § 1.1.1.

18.     The DBA incorporates the Project Manual, which contains a detailed set of additional requirements and obligations for Turner under the Project. *Id.* § 1.1.3.

19.     With respect to permitting, the Project Manual expressly places the burden of obtaining permits on Turner, as follows:

-   "[Turner] is responsible for program and project management, coordinating with jurisdictional agencies and utilities through the Authority Representative; <u>obtaining all necessary permits, approvals and easements</u>; […]"  Project Manual, § 00101(A);

-   "[Turner] must verify that existing site conditions described in the Contract Documents are current and verify all design elements to ensure that the Final Design Specifications and the Final Design Drawings are consistent with the applicable codes and regulations adopted by the governing jurisdictional agencies." *Id.* § 00101(B)(3)

-   "Permits and Jurisdictional and Utility Approvals: <u>It is [Turner's] responsibility to obtain all necessary approvals and permits</u>; however, the Authority will work with [Turner] to support this effort. The Designer shall advance the design so that securing of these jurisdictional permits by the Design-Builder will occur in a timely fashion. *Id.* § 00102(H);

-   "Permits and Responsibilities. <u>[Turner] shall, without additional expense to the Authority, be responsible for obtaining any necessary licenses, permits, and/or temporary easements</u> and for complying with any applicable International, Federal, State, Local or Municipal laws, codes or regulations, in connection with the prosecution of the Work." *Id.* § 00707(A).

Thus, under the Contract, Turner accepted responsibility for all necessary permits for the Project.

20.     Furthermore, as both Turner and Iskalo signed the DBA, Turner accepted the delegation of that responsibility from Iskalo, as expressly contemplated by the MDA.  MDA, § 3.2(b) ("Developer will (or will cause appropriate Project Team members [to]) prepare, file and process . . . applications for the Approvals.").

21.     Despite this delegation to Turner, Iskalo remained liable under the MDA and DBA for obtaining the necessary permits for the Project.  *Id.*

22.     Turner, as the design-builder, and Wendel, as the engineer of record and subcontractor to Turner, were engaged in the permitting process, including the SPA.

**<u>Project Delays</u>**

23.     The Contract schedule created by Turner for Project Completion Date was 596 calendar days after the notice to proceed.

24.     WMATA issued the notice to proceed on February 11, 2014.

25.     The Project Completion Date under the Contract was therefore September 30, 2015.

26.     On October 17, 2017, Fairfax County issued the non-residential use permit for the Project, setting the actual Project Completion Date at October 17, 2017.

27.     The total delay on the Project that has not been accounted for through agreed upon extensions of time is 748 days ("Project Delay").

28.     Turner has asserted that the total delays related to the Rough Grading Plan ("RGP") and Site Plan Approval ("SPA") permitting process was 401 days ("Permitting Delays").  As a party responsible for obtaining the permits related to the Project, Turner is responsible for the Permitting Delays under the Contract.

29.     Turner claims 56 days of Permitting Delays related to the late submission of SPA submission number three.  This delay was the result of Turner's submission of a deficient set of documents and failure to promptly address questions from Fairfax County reviewing authorities.

30.     As part of the Permitting Delays, Turner failed to start site work until June 17, 2014, despite the approval of the Quality Assurance Manager on May 22, 2014.  This delay is Turner's responsibility.

31.     Turner claims 198 days of Permitting Delays related to the late submission of the fourth and final SPA submission.  This delay resulted from Turner's failure to promptly address Fairfax County reviewing authority comments and to resubmit the SPA in a reasonable amount of time.

32.     Turner claims 130 days of Permitting Delays related to the days devoted to the approval process for SPA submission number four. Turner failed to promptly respond to questions from previous SPA submissions that delayed approval, and, approval of the SPA was ultimately not critical to proceeding with work on the site.

33.     As part of the Permitting Delays, Turner failed to advance the design of the retaining walls, which would have allowed Turner to continue to progress the Project without the final SPA.

34.     Turner claims 17 days of Permitting Delays because Turner had to demobilize and re-mobilize while it waited for the final SPA.  These days are Turner's responsibility.

35.     Turner's schedule anticipated that the designs for the site retaining walls would be included in the original RGP submission.  They were not.  The RGP approval was subsequently withdrawn by Fairfax County when it determined—through review of the separate SPA submission—that there was a problem with the storm sewer system interface and the site retaining

walls.  Therefore, the delay from June 17, 2014 through October 3, 2014 (the date of Turner's demobilization from the Site) is Turner's responsibility.

36.     As part of the Permitting Delays, Turner was unable to continue construction until the retaining wall permit was obtained on March 3, 2015.  As Turner failed to advance the design of the retaining wall appropriately the delay from October 3, 2014 (the date of Turner's demobilization from the Site) through April 17, 2015 (the date Turner remobilized and continued construction at the Site) is Turner's responsibility.

37.     Based upon the foregoing, and the fact that Turner was responsible for obtaining all of the necessary permits on the Project and the fact that the Permitting Delays were not caused by WMATA, Turner is responsible and liable for all of the Permitting Delays.

38.     Iskalo is equally responsible for the Permitting Delays under the Contract.

39.     The project was further delayed after April 17, 2015 an additional 448 days ("Additional Delays").

40.     As part of the Additional Delays, Turner failed to timely or reasonably respond when it determined that the quantity and quality of soil on site was insufficient for Turner's need for fill to complete the building pad subgrade.

41.     Turner was responsible for evaluating the quantity and quality of soil on site and assuring sufficient quantity of suitable fill material was available.  After beginning grading activities, Turner determined that the material on site did not meet WMATA's specifications for suitable fill.

42.     Rather than import suitable fill, Turner requested a variance from the specifications, and—despite warnings from Turner's geotechnical experts that the variance would result in delay—assured WMATA that there would be no cost or time impact.  Turner also agreed to a

settlement monitoring requirement necessary for the safe adoption of the variance that extended the time to complete the building pad subgrade.

43.     Turner's failure to properly plan its work and identify a suitable fill material for the building pad subgrade resulted in 98 days of Additional Delays.

44.     As part of the Additional Delays, Turner failed to execute its work to complete the geo piers in accordance with Turner's work plan.

45.     At the completion of the building pad and settlement monitoring period on December 8, 2015, Turner should have been prepared to begin its work on the geo piers immediately.  Turner was not prepared, however, because it had not completed the design and shop drawing approval process.

46.     Turner had not completed the design and shop drawing approval process because Turner's subcontractor repeatedly submitted inadequate or incorrect designs and drawings to Turner.

47.     Over a year after Turner returned its first set of comments on design and shop drawings to Turner's subcontractor, Turner finally submitted the design and shop drawings to WMATA on November 23, 2015.  WMATA reviewed and returned the design and shop drawings three times for changes and corrections to adhere to the Contract specifications, each time responding promptly and within its allowable review time under the Contract.

48.     Turner's late, inadequate and incorrect design and shop drawings resulted in 61 days of Additional Delays.

49.     As part of the Additional Delays, Turner failed to correctly sequence the Project's structural steel activities and adequately allot time for the requirement production associated with concrete work.

50.     Turner's overall planned duration for steel erection was 22 calendar days.  Based on the site limitations and logistics, 22 calendar days was unreasonable because it was based on impracticable stacking of steel activities, and Turner was unable to complete the work in the time it planned.

51.     Turner also planned for overlapping work in concrete that was impractical based on the site and the production requirements.

52.     Turner's unreasonable planning resulted in 59 days of Additional Delays.

53.     As part of the Additional Delays, Turner failed to enforce the schedule for temporary dry-in of the building to allow for installation of weather sensitive duct and conduct, and failed to enforce the schedule for mechanical/electrical/plumbing activities associated with the inspection required before the ceiling could be closed.

54.     Turner's failure to enforce the schedule resulted in 147 days of Additional Delays.

55.     Turner also contributed to other delays on the project by failing to timely file and complete the work required to close out the Project for inspection.

56.     Based on the foregoing, Turner is responsible and liable for the Additional Delays.

## COUNT I
### (Breach of Contract:  Turner)

57.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

58.     The DBA was a valid and enforceable contract.

59.     The Project Manual constituted a part of the valid enforceable contract between WMATA and Turner.

60.     Between the original Project Completion Date and the actual Project Completion Date, there were a total of 748 delay days on the project for which Turner was responsible.

27

61.     Pursuant to the Project Manual, Turner is responsible and liable for all non-excusable and non-compensable delays.  Project Manual Sec. 00728, Termination for Default, Damages for Delay, and Time Extensions.

62.     The Project Manual provides for liquidated damages assessable against Turner for each day of non-excusable delay in the amount of $2,500.00.  Project Manual Sec. 00788, Liquidated Damages.

63.     Thus for 748 days of delay at the liquidated damages rate of $2,500.00, Turner is liable to WMATA for no less than $1,870,000.00 in liquidated damages.


## COUNT II
### (Contribution: Iskalo)

64.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

65.     The Contract requires Iskalo to oversee the permitting process, directing all activities necessary for the SPA.  MDA, § 3.2(b); *see also* DBA, § 1.5.3.

66.     Turner alleges that Iskalo was responsible for obtaining the SPA, and that the delays in obtaining permits were thus Iskalo's responsibility.

67.     Iskalo violated its obligation under the Contract to oversee the permitting process reasonably and with such diligence as to ensure completion of the Project within the schedule specified in the Contract.

68.     As a result of Iskalo's failure to oversee the permitting process reasonably and with appropriate diligence, the Project was delayed by 401 days, and Turner requested payment of direct costs and compensation for days of delay from WMATA.

69.     Iskalo's failure contributed to the Permitting Delays, and Iskalo is liable to WMATA for any payments to Turner for direct costs and days of delay associated with the Permitting Delays.

## COUNT III
### (Breach of Contract: Iskalo)

70.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

71.     The Contract requires Iskalo to oversee the permitting process, directing all activities necessary for the Site Plan Approval.  MDA, § 3.2(b); *see also* DBA, § 1.5.3.

72.     Iskalo violated its obligation to oversee the permitting process reasonably and with such diligence as to ensure completion of the Project within the schedule specified in the Contract.

73.     As a result of Iskalo's violation of its obligation, the Project was delayed by 401 days.

74.     WMATA was damaged by the delay of the Project.

75.     The Project Manual provides for liquidated damages that represent a reasonable estimation of the damages WMATA suffers for each day of delay, $2,500.00.  Project Manual Sec. 00788, Liquidated Damages.

76.     Thus, at the very least, for 401 days of delay, Iskalo is liable to WMATA for no less than $1,002,500.00.

## PRAYER FOR RELIEF AND DAMAGES

Wherefore, Defendant/Counterclaim Plaintiff demands the following:

(1) that the Court enter judgment against Turner for liquidated damages under the Contract in an amount to be determined at trial, but in no event less than $1,870,000.00, plus pre- and post-judgment interest;

(2) that the Court enter judgment against Turner for actual and compensatory damages in an amount to be established at trial, if applicable;

(3) that the Court enter judgment for contribution in favor of WMATA against Iskalo for any liability to Turner in its Complaint;

(4) that the Court enter judgment against Iskalo for damages under the Contract in an amount to be determined at trial, but in no event less than $1,002,500.00, plus pre- and post-judgment interest; and

(5) that the Court award such other and further relief to WMATA as this Court may deem proper.

Dated December 5, 2017               WASHINGTON METROPOLITAN AREA
                                     TRANSIT AUTHORITY
                                     By counsel

                                       _/s/ Attison L. Barnes, III_
                                     Attison L. Barnes, III (VA Bar No. 30458)
                                     Christopher M. Mills (VA Bar No. 44358)
                                     Samantha S. Lee (*pro hac vice*)
                                     WILEY REIN LLP
                                     1776 K Street, NW
                                     Washington, DC  20006
                                     Tel: (202) 719-7000
                                     Fax: (202) 719-7049
                                     abarnes@wileyrein.com
                                     *Counsel for Defendant*
                                     *Washington Metropolitan Area Transit Authority*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 5, 2017, I electronically filed the forgoing with the Clerk of Court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following:

Douglas L. Patin (VA Bar No. 20324)
Thomas R. Lynch (VA Bar No. 73158)
Amy E. Garber, Esq. (VA Bar No. 83098)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street, N.W., Suite 1350
Washington, DC 20036
Telephone: (202) 719-8241
Facsimile: (202) 719-8341
Email: dpatin@bradley.com
       tlynch@bradley.com
       agarber@bradley.com

 */s/ Attison L. Barnes, III*
Attison L. Barnes, III (VA Bar No. 30458)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel: (202) 719-7000
Fax: (202) 719-7049
abarnes@wileyrein.com
*Counsel for Defendant*
*Washington Metropolitan Area Transit Authority*