**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| TURNER CONSTRUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No.  1:17-cv-799 (LMB/TCB) |
| | ) | |
| WASHINGTON METROPOLITAN | ) | |
| AREA TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant, Counterclaim Plaintiff, | ) | |
| and Third-Party Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ISKALO CBR LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

_____

**TURNER CONSTRUCTION COMPANY'S SECOND AMENDED COMPLAINT**

Turner Construction Company ("Turner"), by counsel, for its Second Amended Complaint against Defendant, Washington Metropolitan Area Transit Authority ("WMATA"), states the following:

**NATURE OF THE ACTION**

1.     This is an action for breach of contract arising out of WMATA's failure to compensate Turner for permitting delays that were outside of Turner's control (Count I); WMATA's failure to issue a change order for Turner's providing a dedicated change order engineer as a result of those delays (Count II); WMATA's failure to compensate Turner for delays resulting from unsuitable soils and WMATA's interference with critical submittal approvals related to geo-piers (Count III); WMATA's breach of contract submittal requirements relating to fire safety (Count IV); WMATA's failure to compensate Turner for delays and costs resulting from

third party utility delay (Count V); WMATA's failure to compensate Turner for various proposed change orders for extra work that Turner performed (Count VI); and WMATA's failure to pay Turner the remaining contract balance for the contract work that Turner fully performed (Count VII).

## PARTIES

2.      Turner is a construction company incorporated in New York with its principal office in New York, New York.

3.      WMATA is an agency under the jurisdiction of the District of Columbia, Virginia, and Maryland, with its principal office in the District of Columbia.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant 28 U.S.C. § 1331, because Congress has consented to the WMATA Compact of 1966, Va. Code § 33.2-3100.  Pub. L. No. 86-794 (74 Stat. 1031, as amended by 76 Stat. 764).

5.      Paragraph 81 of the WMATA Compact of 1966 states that "[t]he United States District courts shall have original jurisdiction, concurrent with the courts of Maryland, Virginia and the District of Columbia, of all actions brought by or against the Authority."

6.      Venue is proper in this judicial district under section 6.1 of the Design-Build and Construction Coordination Agreement between Turner and WMATA, which states that "[t]he sole and exclusive venue for any lawsuit arising out of or relating to this Agreement shall be the Circuit Court of Fairfax County or the United States District Court for the Eastern District of Virginia."

7.      Venue is also proper under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

2

**Count I**
**(Breach of Contract – Rough Grading Plan and Site Plan Approval Delays)**

**The Contract**

8.      In July 2009, WMATA designated Iskalo CBR LLC ("Developer") as the developer for real property located at 7901 Cinder Bed Road, in Fairfax County, Virginia ("Site").

9.      On April 28, 2010, WMATA and the Developer entered into a Master Development Agreement ("MDA") for the design, development and construction of the Cinder Bed Road Bus Operations and Maintenance Facility (the "Project") at the Site.

10.     On September 13, 2013, Turner submitted a Guaranteed Maximum Price Technical Proposal ("GMP Proposal") to WMATA for the Project, which was amended October 10, 2013.

11.     On October 25, 2013, Turner and WMATA entered into a "Design-Build and Construction Coordination Agreement" ("DBA") for the Project.  WMATA officially awarded the contract to Turner on October 28, 2013.

12.     The DBA Contract Documents consist of:

1.1.1   The MDA dated April 28, 2010 between Washington Metropolitan Area Transit Authority and Iskalo CBR LLC[;]
1.1.2   the Project Manual for the Cinder Bed Road Bus Operations and Maintenance Facility, all amendments thereto, and documents referenced [in] or attached to the Project Manual (collectively the "Project Manual"). The Project Manual is annexed hereto as Exhibit A; and
1.1.3   this Agreement and all amendments thereto, and documents referenced [in] or attached to it.

DBA, § 1.1.

13.     The DBA references the GMP proposal at page one and states, in relevant part: "Design-Builder has . . . submitted a Guaranteed Maximum Price Proposal offering to design and construct the Project in strict accordance with the provisions of the Project Manual in consideration of the Guaranteed Maximum Price as provided in this Agreement.  The Authority wishes to accept

3

that Proposal."  DBA at 1. Thus, Turner's GMP proposal is included in the definition of Contract

Documents.

14.     This Complaint refers to the DBA, MDA, Project Manual, and GMP collectively

as the "Contract."

15.     The Project Manual requires WMATA to issue an equitable adjustment for any

change that increases the cost or time of performance:

> D. If any change under this Section causes an increase or decrease in the Design-Builder's cost of, or the time required for, the performance of any part of the work under this Contract, whether or not changed by any order, an equitable adjustment shall be made and the Contract modified in writing accordingly[.]

Project Manual, § 00753(D).

16.      Turner's GMP Proposal states, "[t]he GMP excludes any cost or time associated

with permitting delays that are outside the control of Turner." GMP Proposal, Bid Proposal

Assumptions and Clarifications, ¶ 29 (emphasis added).  Thus, contractually, Turner had no

responsibility for permit delays outside of its control.

### Site Plan Approval

17.     The site plan approval ("SPA") was a prerequisite to obtaining the required Land

Disturbance and Storm Water permit from Fairfax County, Virginia.  The rough grading plan

("RGP") represents a portion of the SPA.  The RGP is a partial site plan.  All aspects of the RGP

are part of the SPA.

18.     The MDA states that the Developer is responsible for obtaining the SPA:

> Developer will (or will cause appropriate Project Team members [to]) prepare, file and process, with the approval and cooperation of WMATA (which approval shall not be unreasonably withheld, conditioned or delayed), applications for the Approvals and attend and present the Project at public hearings and other meetings relating to the approvals.  . . .  As part of its Pre-Acquisition Services, Developer shall perform all necessary underlying studies and surveys related to the Approvals. With the consent of WMATA, Developer, as soon as practicable after filing of the

4

<u>applications for Special Exception Permits, shall also seek permission for concurrent processing of the Site Plan Approval application and subsequently file same upon its completion so as to expedite procurement of Site Plan Approval.</u> WMATA acknowledges and accepts that concurrent processing of the Site Plan application may not result in procurement of Site Plan Approval prior to the Outside Date and is therefore, not a pre-condition to WMATA's closing on the acquisition of the Site.

MDA, § 3.2(b) (emphasis added).

19.     The DBA states that the duties of the Developer include obtaining the SPA:

### 1.5     Duties of the Developer

In furtherance of its duties under the MDA, Developer shall perform the obligations described below.

* * *

**1.5.3** <u>Site Plan Approval</u> - Developer shall direct all activities necessary for application and procurement of Site Plan Approval from Fairfax County for the Project, including procurement of any necessary variances.

DBA, § 1.5.3.

20.     Exhibit G attached to the Second Amendment to the MDA (dated December 17, 2010) states that the MDA budget includes $321,977 for "Site Plan Approval."

21.     Turner could not begin its work as planned until the SPA was obtained.  Turner's plan of construction was based on receiving the SPA by December 6, 2013.

### The RGP and SPA Delays

22.     The contract schedule in Turner's GMP Proposal included a milestone date of December 6, 2013 for the SPA.

23.     For reasons outside of Turner's control, the SPA was not obtained by December 6, 2013 and caused protracted delays to Turner's work.

5

24.     To mitigate the SPA delay and begin some of its work, Turner applied for the RGP so that it could perform limited erosion and sediment controls, tree preservation/removal, and storm water bypass work.  The RGP would not have been necessary if the Developer had timely obtained the SPA by December 6, 2013.  The Contract did not require Turner to obtain the RGP.

25.     On January 24, 2014, Fairfax County approved the RGP, contingent on WMATA signing a conservation agreement and providing a letter of credit.

26.     On March 10, 2014, Turner notified WMATA via letter that WMATA was delaying the RGP approval process by failing to sign the conservation agreement and to provide the letter of credit, and stated, in relevant part:

> Turner is continuing to experience delays in the permitting process, specifically in regards to the release of the [RGP] which is pending the Conservation Agreement being signed by WMATA as well as the necessary letter of credit that is required. This delay is directly impacting the critical path in that we cannot start work without release of the [RGP].

27.     On May 19, 2014, WMATA signed the conservation agreement and Turner was able to begin limited erosion and sediment controls, tree preservation/removal, and storm water bypass work under the RGP.

28.     On July 11, 2014, Fairfax County established new requirements for the RGP and withdrew its January 24, 2014 approval of the RGP.

29.     On October 1, 2014, because there was still no SPA, Turner could not perform any further work, and Turner was forced to demobilize.

30.     Although the Contract did not require Turner to re-submit the RGP, Turner re-submitted the RGP so that it could progress and mitigate delays caused by the Developer's failure to obtain the SPA.  On October 23, 2014, Fairfax County approved a revised RGP and this

6

approved RGP enabled Turner to mitigate the lack of the SPA and to begin submitting plans for the retaining walls for the required permits from Fairfax County.

31.     On May 20, 2015, rather than the December 6, 2013 date in the GMP contract schedule, the Developer obtained the final SPA from Fairfax County, Virginia.

32.     The RGP and SPA delays were outside of Turner's control.

33.     The RGP and SPA delays caused 401 days of critical path delay to the completion of Turner's DBA, for which Turner is entitled to an equitable adjustment and/or breach of contract damages.

### WMATA Change Orders for Permitting Delays

34.     WMATA issued change orders to compensate subcontractors for direct costs and delay costs that the RGP and SPA delays caused Turner and its subcontractors. The issuance of these change orders by WMATA constituted an admission of liability by WMATA to pay Turner for the RGP and SPA delays.

35.     On June 14, 2016, WMATA issued Unilateral Prime Contract Modification No. 008, Part 1 in the amount of $137,487 "to compensate subcontractors . . . for the agreed costs relating to Fairfax County's scope of work changes during the Rough Grading Permitting process." WMATA signed this modification on June 15, 2016.

36.     On October 28, 2016, WMATA issued Prime Contract Modification No. 008, Part 1A in the amount of $490,456 "to compensate the impacted subcontractors for the direct costs, markups and overhead included in the final agreed amount . . . relating to Fairfax County's scope of work changes during the Rough Grading Permitting (Turner's PCOs 025 & 039) and Site Plan (Turner's PCO 029) process." Turner signed this modification on November 17, 2016, and WMATA signed this modification on November 21, 2016.

7

37.     On March 16, 2017, WMATA issued Prime Contract Modification No. 015, Part 1 in the amount of $574,113 "to pay some subcontractor direct costs relating to Turner's PCO 038, Request for Equitable Adjustment, for Site Plan Permit Delays." Turner signed this modification on March 17, 2017, and WMATA signed this modification on March 24, 2017.

### WMATA's Failure to Compensate Turner for the RGP and SPA Delays

38.     Even though WMATA recognized Turner's entitlement to be paid for the RGP and SPA delays by issuing change orders compensating subcontractors for those delays, WMATA refused to provide an equitable adjustment to Turner for the RGP and SPA delays.

39.     On June 21, 2016, Turner submitted a request for equitable adjustment ("REA") under Proposed Change Order ("PCO") No. 038 seeking an increase in the GMP in the amount of $6,532,733 and a 401-day extension in the contract time for the RGP and SPA delays. This amount was subsequently revised to $6,514,845.

40.     On July 11, 2016, while the REA was pending, Turner and WMATA participated in a hearing before a Disputes Review Board ("DRB") pursuant to section 01260 of the Project Manual.

41.     On July 11, 2016, the DRB orally ruled that it was not Turner's responsibility to obtain the SPA.

42.     In a letter dated July 13, 2016, Turner confirmed the DRB decision and proposed to WMATA a path forward for resolving the REA.

43.     In a letter dated September 2, 2016, WMATA notified the Developer of Turner's REA and acknowledged that the Developer, and not Turner, was responsible for obtaining SPA. That letter stated, in relevant part:

> It is Turner's position that the current delays to the project completion were directly caused by the late acquisition of the Site Plan Approval (SPA) for which it bears

no responsibility.  Be advised that a Disputes Review Board (DRB) established by the contract agrees with Turner in its July 11, 2016 ruling.  The DRB ruled that based upon duties as assigned in both the MDA and the [DBA] that Turner was not responsible for obtaining the Site Plan Approval.

The Authority plans to initiate negotiation meetings with Turner in Washington DC during the week of September 12, 2016.  Iskalo is invited to be present as these negotiation meetings proceed, <u>since it is believed that based upon duties as assigned in both the MDA and the [DBA] that Iskalo, as the responsible party for the acquisition of the SPA, is also responsible for delays related to the SPA.</u>

(Emphasis added).  This letter constituted an admission by WMATA that Turner was entitled to be paid for the RGP and SPA delays.

44.    However, on February 24, 2017, WMATA issued a letter with findings relating to REA No. 038, stating that "WMATA is not liable for any delays resulting from the Site Plan approval process and therefore Contractor's claim has no merit."

45.    On April 20, 2017, Turner and WMATA met to discuss the RGP and SPA delays and WMATA refused to change its position that Turner was not entitled to compensation.

46.    On May 19, 2017, Turner sent a letter to WMATA restating its entitlement to be paid for the REA.

47.    On June 29, 2017, WMATA issued a final decision denying REA PCO No. 038.

**Administrative Costs Resulting from RGP and SPA Delay**

48.    On October 5, 2016, Turner notified WMATA that it was providing a dedicated change order engineer to handle the change orders that the RGP and SPA delays necessitated.

49.    On October 21, 2016, Turner provided WMATA an estimate of $180,000 for the costs for providing the change order engineer for four to six months.

50.    On June 15, 2017, WMATA sent a letter from the contracting officer stating that it would issue a change order for PCO No. 144 by June 30, 2017 to pay for these costs.  WMATA did not issue that change order and has breached the contract by failing to do so.

51.     On September 21, 2017, Turner submitted its "official request for a Contracting Officer's Final Decision" on PCO No. 144 to WMATA's Contracting Officer.  That request sought a total of $122,487, the difference between the costs through September 1, 2017 ($178,077), and $55,590 that WMATA paid for change order engineer costs in a Davis Bacon wage act change order.

52.     On January 5, 2018, WMATA issued a Contracting Officer's Final Decision on PCO No. 144 which disputed the amount of Turner's claim.

53.     The Contracting Officer's Final Decision stated: "This is the Final Decision of the Contracting Officer.  . . . The decision of the Contracting Officer is final and conclusive unless, within thirty (30) calendar days from the date of receipt of such copy, the Design-Builder commences litigation in accordance with Article 00732 of the Contract."

54.     On January 23, WMATA issued unilateral Prime Contract Modification No. 27, which agreed to pay an additional $51,835 towards Turner's request for equitable adjustment for the SPA change order engineer, leaving an outstanding claim of $70,652.

55.     Turner and WMATA entered into a valid and enforceable Contract, in which WMATA agreed that the "[t]he GMP excludes any cost or time associated with permitting delays that are outside the control of Turner."

56.     The Contract required WMATA to provide an equitable adjustment for any change that increased Turner's cost or time of performance.

57.     The RGP and SPA delays increased Turner's cost and time of performance.

58.     The RGP and SPA delays were outside the control of Turner because the Developer was responsible for obtaining the SPA.

10

59.     WMATA has admitted that Turner is entitled to recover for these delays by issuing change orders paying in part for delays encountered by Turner's subcontractors, and in its September 2, 2016 letter to the Developer.  WMATA has materially breached the Contract by issuing a final decision denying any entitlement for the RGP and SPA delays.

60.     As a result of WMATA's material breach, Turner is entitled to recover the amount of $6,514,845 as an equitable adjustment and/or breach of contract damages.

<u>**Count II**</u>
**(Breach of Contract – Administrative Costs for Change Order Engineer)**

61.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

62.     Turner and WMATA entered into a valid and enforceable Contract, in which WMATA agreed to provide an equitable adjustment for any change that increased Turner's cost or time of performance.

63.     As a direct result of the RGP and SPA delays, Turner was forced to provide a change order engineer to handle change orders that provided compensation for the increased costs that the RGP and SPA delays caused.

64.     WMATA materially breached the Contract by agreeing to pay for such engineer and then by failing to issue a change order to provide an equitable adjustment for the administrative costs of providing a change order engineer.

65.     Turner's appeal of the Contracting Officer's Final Decision is timely because Turner has raised the claim in this Court within 30 days of the Contacting Officer's Final Decision.

66.     As a result of WMATA's material breach, Turner is entitled to recover the amount of $70,652.

## Count III
### (Breach of Contract – Soil Variance, Geo-Pier Interference Delays)

67.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

68.     During the process of re-mobilizing to commence site development work, Turner and its subcontractors encountered soil conditions resulting in critical path delays, and subsequent constructive changes where WMATA interfered with Turner's Contract performance relating to soil conditions and geo-piers.

### Soil Variance Delays

69.     Line item 3 of Turner's GMP Proposal Assumptions and Qualifications states:

> 3. The GMP is based on, and to the best of the design builder's knowledge, utilizing a minimum 13,000 cubic yards of suitable on-site materials for fill amount. In the event that actual site conditions encountered do not allow for this amount, any deficit is excluded from the GMP.

GMP Proposal, Bid Proposal Assumptions and Clarifications, ¶ 3.

70.     Turner discovered on-site soil materials that could not be utilized on the Project as qualified and quantified in Turner's GMP Proposal.

71.     On May 19, 2015, DMY Engineering ("DMY"), the third party inspector, submitted soil proctors test results from a trench excavation for approval to use that soil as onsite backfill. On June 2, 2015, WMATA notified Turner that the on-site soil material could not be utilized for backfill because it did not meet WMATA's Contract specifications.

72.     In order to confirm the extent of the unsuitable on-site soils, DMY submitted on July 6, 2015 additional soil proctors (S-1, PU-1, PU-2, and PU-3) from June 24, 2015 samples, and on July 9, 2015, submitted a soil proctor (S-2) from a July 2, 2015 sample. These proctors confirmed that the on-site soils did not meet WMATA's Contract soil specifications.

73.     Following the discovery of these conditions, WMATA delayed Turner by::

- Requiring Turner to submit an unnecessary soils variance and substitution request;
- Failing to timely approve the soils variance and substitution request;
- Failing to timely approve the geo-pier foundation design; and
- Failing to reasonably limit WMATA's submittal review to the performance-based requirements of Contract specification 02350 (Aggregate Pier Ground Improvement Systems).

74.     WMATA, through its Authority Representative, Fred Robertson, directed Turner via email on July 14, 2014, to submit a soils variance and substitution request.

75.     The variance and substitution request and approval process should have taken one week.  As result of WMATA's improper review and unwarranted disapprovals, the process took several months.

76.     WMATA's directive to Turner to submit a variance and substitution request was unnecessary in the first place.  The purpose of the soils variance was to resolve the inconsistencies among WMATA's Contract specifications, site conditions, and the Fairfax County Public Facilities Manual and to allow the use of the onsite soils, which was the intention of the Project all along, and consistent with how Turner's GMP was qualified and priced.

77.     WMATA directed the soil variance and substitution request to avoid paying a large increase in the GMP if Turner had to export and import large volumes of soils material as a result of the unsuitable on-site soils.

78.     Turner submitted Request for Information ("RFI") Nos. 73 ("Settlement Monitoring") and 74 ("Settlement Calculations vs. Geopier Design")  to permit the Designer of Record for the Project and WMATA to confirm and memorialize WMATA's direction to Turner, during a September 2, 2015 meeting, to submit the soils variance request.

13

79.     On September 10, 2015, WMATA approved Turner's soils variance and substitution request.  WMATA qualified its approval with a change requirement for additional soils settlement monitoring.

80.     This qualified WMATA approval came three months after the unsuitable soils conditions became an issue.  WMATA's qualified approval caused Turner to incur additional costs.

## Geo-Pier Delays

81.     Despite WMATA's qualified approval of the soils variance, WMATA's delays rendered it impossible for Turner to mitigate delays to the engineering and installation of the geo-piers.

82.     Hayward Baker was Turner's delegated subcontractor Design Builder for the geo-piers foundations. Turner's Designer of Record, Wendel, approved as noted Hayward Baker's geo-pier design submittal on September 24, 2014.

83.     Turner demobilized from the project site on October 1, 2014 as a result of the ongoing SPA delays set forth in Count I.

84.     During the ongoing discussion of WMATA's demand for a soils variance to address the unsuitable condition of the soils, and with an expedited review of the soils variance expected from WMATA, Hayward Baker and other Project team members, including WMATA, conducted the geo-pier preparatory meeting on July 15, 2015, in preparation for Hayward Baker's imminent mobilization to the site.

85.     Hayward Baker reviewed the new information WMATA was requiring, as well as RFI Nos. 73 and 74.  Hayward Baker completed its final engineering and calculations and then resubmitted the geo-pier design submittals on October 26, 2015.  On November 4, 2015, Wendel

14

approved as noted the geo-pier design submittal.  On November 6, 2015, Hayward Baker's general superintendent visited the project and confirmed the building pad was ready for its equipment mobilization.

86.     Despite the site now being ready for the geo-piers installation, Turner could not proceed because Turner's geo-pier design was placed on hold, pending WMATA's protracted approval of the soil variance and substitution request that it had directed Turner to submit.

87.     When the geo-pier subcontractor finally had sufficient information to complete its engineering and submissions, WMATA failed to reasonably limit its review of those submittals to the performance-based requirements of Contract specification 02350 (Aggregate Pier Ground Improvement Systems).  WMATA's failure to comply with this specification further delayed the Project.

88.     On November 23, 2015, WMATA and Turner held their monthly executive meeting.  At that meeting, WMATA agreed to expedite its review of the geo-pier design submittal.

89.     On November 24, 2015, Turner submitted the Wendel approved geo-pier design submittal to WMATA.  On December 7, 2015, WMATA rejected the geo-pier design submittal for invalid, arbitrary reasons.

90.     The December 7, 2015 WMATA rejection demonstrated WMATA's lack of experience with geo-pier design methods and WMATA's failure to reasonably limit its review to the performance-based requirements of Contract specification 02350.

91.     WMATA's initial review comments improperly questioned the design mechanics and empirical parameters and interfered with Turner and Hayward Baker's design discretion by, among other things, requiring Hayward Baker to submit unnecessary additional design

15

information.  These unwarranted questions and requests delayed the progress of the work and constituted a breach of Contract.

92.     On December 8, 2015, Turner held a conference call with WMATA and its structural engineers to discuss WMATA's submittal comments.  Hayward Baker prepared its formal resubmission with the unnecessary additional design information WMATA demanded in its December 7, 2015 review comments.

93.     On December 18, 2015, WMATA again rejected the geo-pier design submittal and included similarly invalid review comments.  Like the December 7, 2015 rejection, WMATA's second rejection was an improper interference with Turner and Hayward Baker's design discretion, delayed the work, and constituted a breach of Contract.

94.      WMATA continued to interfere with Turner's design discretion on December 24, 2015, when WMATA's structural engineers reneged on a qualified approval that WMATA authorities Farhad Farhangi and Fred Robertson had verbally provided to Turner on December 23, 2015.  As a result, on December 30, 2015, Turner notified WMATA that the improper WMATA submittal rejections were causing significant schedule delays to the Project.

95.     On January 23, 2016, WMATA for the first time, via email, provided a qualified approval of the geo-pier design submittal.

96.     Turner is entitled to a 116 calendar day compensable time extension in the amount of $1,275,833, due to schedule delays caused by the unsuitable soil conditions along with WMATA's interference of critical submittal approvals, which constituted breaches of Contract.

97.     By letter dated December 22, 2017, Turner requested a decision from the Contracting Officer under the Contract Disputes Clause on its claim of $1,275,833 for 116 calendar

days of compensable delay.  The Contracting Officer has failed to issue a final decision breaching

the contract, entitling Turner to sue on this claim in this Court as a "deemed denial."

<u>**Count IV**</u>
**(Breach of Contract – Fire Alarm, Fire Protection, and Additional Owner Changes Delays)**

98.     The allegations in the foregoing Paragraphs are incorporated herein by reference as

if fully stated herein.

99.     Contract specification 01610 2.01 C.3 permits the use of an "approved equal"

product under the following circumstances:

> Where the Final Design Drawings and Final Design Specifications list products
> or manufacturers that are available and acceptable for incorporation into the
> Work, accompanied by the term '...or equal' or '...or approved equal,' the
> Design-Builder may propose any available product that complies with Contract
> requirements.

100.     During the submittal process, WMATA breached the "approved equal"

specification by forcing Turner to use a single source Edwards Fire Alarm System in lieu of an

"approved equal."

101.     The submittal and approval process for the Project's fire alarm system commenced

in February 2016.

102.     VarcoMac, Turner's electrical subcontractor, subcontracted the fire alarm system

to Red Hawk Fire & Security, LLC ("Red Hawk"), as a design build partner who had in-house fire

alarm engineering expertise.

103.     Turner initially submitted VarcoMac/Red Hawk's fire alarm submittal to Wendel

on March 3, 2016.  On March 16, 2016, Wendel approved the fire alarm submittal.   On March 18,

2016, Turner submitted the approved submittal to WMATA.

104.     On March 18, 2016, WMATA returned the submittal as "Rejected Code 3" and

noted:

17

> This submittal is Rejected Code 3 based on the specifications calling for Edwards EST 3 system as per spec 16731.2.03 . . . If this is a substitution please follow the following guidelines as found in the Specifications. See Contract specification Section 01610 2.01 C.3 for requirements of 'approved equal'.

105. Turner's Project Engineer, Angela Pedersen, followed up immediately with WMATA's Representative, Brian Desrochers, regarding this rejection of the fire alarm system.

106. On March 21, 2016, WMATA provided the following email response directing Turner to use an Edwards fire alarm system:

> Angela, just to follow up, I spoke with WMATA Reviewers, anything other than Edwards fire alarm system will be rejected. Edwards is the standard their system is based upon.

107. On March 21, 2016 Turner forwarded the rejected fire alarm submittal to VarcoMac. VarcoMac stated that it would direct Red Hawk to provide the Edwards systems, but it would also provide a substitution request to utilize the Honeywell System, which was approved by Wendel and Turner.

108. Turner resubmitted VarcoMac's submittal and substitution request to WMATA on July 25, 2016. On July 27, 2016, WMATA again returned the fire alarm submittal as "Rejected Code 3," with the following comment:

> WMATA is currently replacing all systems at bus locations with Edwards EST3's. Therefore in keeping with that, please provide the product called out in the specifications.

109. WMATA's change requiring Turner to only use the Edwards system violated the "approved equal" specification and constituted a breach of Contract.

110. A series of emails and phone conversation between Turner's Project Manager, Andrew Craig, and WMATA's Project Manager, Fred Robertson, occurred between July 27, 2016 and August 3, 2016.

18

111.    On July 27, 2016, Turner advised WMATA as follows:

> Should WMATA agree that the alternate system is equivalent, then Turner would expect a C35A / PCO directive to proceed with Edwards system.  If WMATA considers the alternate product not equivalent, then on a point by point basis of the product functionality, Turner will expect a written response.

112.    Also on July 27, 2016, WMATA's Fred Robertson advised Turner via email as follows:

> After giving it some more thought, I'm not sure that my position is the same. The specification says 'or approved equal', but if we haven't approved an equal and the GMP doesn't qualify using a different product, then I'm thinking Turner would be obliged to use the specified product, which is the product that we actually want.
>
> Submit a claim to get the process started on your end. I'll talk to someone else to see how we've handled it on other jobs.

113.    Turner advised VarcoMac of WMATA's interpretation of the "approved equal" specification and WMATA's change to proceed with the Edwards system.  Turner suggested that VarcoMac submit a claim for the additional costs.

114.    In August 2016, VarcoMac began negotiating and procuring the single source Edwards's fire alarm system from Orion.

115.    Red Hawk, the original fire alarm contractor, was not an Edwards-approved installer and could not provide the Edwards system.  As a result, VarcoMac had to procure a new subcontractor which could provide the Edwards system.

116.    WMATA's violation of the "approved equal" specification forced VarcoMac to utilize a new subcontractor mid-Project, resulting in significant schedule delays and additional direct costs relating to re-procurement of the fire alarm subcontract. These delays extended the shop drawing and submittal process and ultimately delayed the permitting approval by Fairfax County.

117.   The team of VarcoMac and Red Hawk had a track record of success in Fairfax County on numerous projects of similar or greater size and complexity to the Project.  WMATA's Contract violation eliminated VarcoMac's valued subcontracting design assist partner from Turner's plan.

118.   Turner requested an equitable adjustment for the direct costs for the change to the Edwards system through letter L-165 and PCO No. 147. WMATA issued Prime Contract Modification No. 21 on August 21, 2017, which included a negotiated sum of $34,277, only for the direct costs associated with WMATA's change.

119.   Prime Contract Modification No. 21 demonstrates WMATA's recognition that it changed the contract when it directed Turner to use an Edwards system. In Part V of Prime Contract Modification No. 21, Turner reserved its right to seek "schedule extension, cost impacts, and associated Turner contingency and markups resultant of this change."

120.   WMATA's change to requiring an Edwards system delayed the submittal, shop drawing, permit and installation process of the fire alarm system.

121.   In addition to the arbitrary change WMATA made to the fire alarm system, the Fire Marshall of the Authority Having Jurisdiction, Fairfax County, applied interpretations of the relevant code requirements -- Parts Storage, Upholstery, paint booth, and dry system for communications closets -- which required a change from the "Hazards designation" WMATA initially approved in Turner's GMP Proposal.  The change was necessary to comply with Fairfax County's interpretation, to achieve the required fire protection permit, and to complete the engineering and installation of the fire protection system.

122.   On January 13, 2017, Turner advised WMATA in letter L-162 that in order for the Project to receive the required fire protection permit as currently designed and accepted in Turner's

GMP Proposal, the design build team would need additional storage quantity information from WMATA -- the end user for both the Parts Storage and Upholstery Storage areas -- to verify to Fairfax County that the Hazards Designations in the GMP Proposal were correct for their intended use.

123.    WMATA, in turn, provided its parts material lists on January 23, 2017 and January 24, 2017.  The storage quantity information WMATA provided was not adequate to answer Fairfax County's fire protection reviewer's comments.  WMATA breached the Contract by failing to provide sufficient storage quantity information to facilitate the fire alarm system installation.

124.    On February 7, 2017, Turner's Project Manager, Andrew Craig, emailed WMATA to offer two paths forward to mitigate the impact of the revised storage requirements, and asked WMATA to review its own mitigation efforts.

125.    On February 17, 2017, in letter L-162R, Turner notified WMATA of the ongoing delays in addressing the Fire Marshal's comments regarding the storage requirements of WMATA. Given the failure of WMATA to provide sufficient storage quantity information, Turner had to proceed to Extra Hazard Group 2-the highest hazard level-to mitigate the impact and receive the fire protection permit.

126.    Also on February 17, 2017, Turner representatives met with WMATA's Chief Engineer, John Thomas, and WMATA's Contracting Officer, Norie Calvert. Turner advised WMATA at this meeting that it would be in the Project's best interests to simply move forward with the Extra Hazard Group 2, which was a change in scope from the GMP, and which would allow the final engineering to complete, enable Turner to receive the fire protection permit, and allow Turner to begin the process of fabricating fire protection pipe and mitigate the impact of the change in storage requirements.

21

127.     On March 6, 2017, WMATA arbitrarily overruled its own responsibility to provide sufficient information to meet Fairfax County's permitting requirements, and further refused to cooperate in providing a usable list of materials and how they would be stored.

128.     On March 7, 2017, in letter L-185, Turner requested WMATA provide further information on how it intended to store its materials.  Turner never received a response to its request.  WMATA's failure to respond to Turner's request was a breach of WMATA's duty to cooperate.

129.     By letter dated March 26, 2018, Turner submitted to the Contracting Officer for a decision a claim for $2,858,038 and 231 days of delay, of which 223 days were compensable and 8 were non-compensable.  The Contracting Officer has never responded to the claim, breaching the contract and entitling Turner to sue in this Court for the claim as a "deemed denial" from the Contracting Officer.

### Count V
### (Breach of Contract – Washington Gas Delays)

130.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

131.     Line item 21 of Turner's GMP Proposal Assumptions and Qualifications states: "GMP excludes any Costs for delays attributable to any utility company or 3rd party not coordinating their work with the construction."  GMP Proposal, Bid Proposal Assumptions and Clarifications, ¶ 21.

132.     On May 24, 2017, in letter L-201, Turner notified WMATA that Washington Gas was interfering with Turner's work by performing work at the old site entrance.  On September 12, 2017, in letter L-282, Turner notified WMATA again that Washington Gas was interfering with Turner's work by performing work at the old site entrance.

133.     On September 22, 2017, WMATA, via letter to Turner, stated, "Turner is not permitted to commence with any work that would interfere with Washington Gas's ability to complete the gas line relocation."

134.     On November 3, 2017, Turner again advised WMATA of the interference Washington Gas was causing to Turner's work and the damage Washington Gas was causing to the work site.

135.     Once Washington Gas demobilized from Turner's work area, it left its work area flooded and muddy, with damaged storm pipe.  By letter dated December 1, 2017, WMATA's Contracting Officer agreed that Washington Gas had created differing site conditions and directed Turner to repair the damage caused by Washington Gas to the Turner work site.

136.     By letter dated December 18, 2017, Turner submitted its change order proposal for the direct and delay costs for 206 days caused by the Washington Gas interferences and damage it caused to the work site.  WMATA did not respond to this request.  By letter dated March 25, 2018, Turner requested the Contracting Officer to issue a final decision on the Washington Gas delay for 206 days and $588,189 and other outstanding PCO's, including Turner's costs to repair the damage Washington Gas caused to the work site.  The Contracting Officer has failed to issue a final decision entitling Turner to file suit on this claim as a "deemed denial" from the Contracting Officer.

137.     Turner subsequently reduced the claim amount to $556,275 to account for the removal of a 7% Construction Contingency.

### Count VI
### (Pending Direct Cost PCOs Awaiting a Contracting Officer's Final Decision)

138.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

139.     Turner submitted the following PCOs to WMATA for additional change order work ordered or required by WMATA.  All of these PCO's involve additional work not contained within the GMP.  Turner has requested a Contracting Officer's final decision on each one and the Contracting Officer has failed to issue a final decision on them, constituting a breach of contract and constituting a "deemed denial" on each claim, entitling Turner to file suit for recovery of them.  These pending PCO's are as follows:

| PCO Number | Description | Claimed Amount |
|---|---|---|
| 017 | Paint Storage Threshold (item 65) | $1,523 |
| 019 | Change Single Swing to Double Swing Door L9-1 (item 68) | $1,998 |
| 023.1 | Shop Equipment Changes - Original, Deletion of Shop Lights, and PCO 123 Submittal Changes | ($182,995) |
| 040 | South Bypass Storm Piping Undercut | $9,005 |
| 046 | Removal of subsurface Obstructions including PCO's 041, 079 & 098 | $92,440 |
| 047 | Backfill Material For Outfall #2 Undercut PCO's - Various (047, 073, 078, 089, 099, 102, 117, 120, 126, 139, 146, 152, 156, 171, 172) | $468,791 |
| 048.1 | Precast Award Change | $41,573 |
| 056.3 | Davis Bacon Wage Rate Impact - Part 3 | $434,249 |
| 073 | Unsuitable Soil at North Bypass (DMY Report 4/30/2015 46) | in PCO 047 |
| 075 | Undercut at Vault 2 | $2,459 |
| 078 | Per WMATA/DMY Undercut 18in at South Side of Bridge (MSE Wall #1 from Bridge to construction entrance) | in PCO 047 |
| 080 | Undercut at Vault 1 | $89,993 |
| 082 | Undercut at Vault 3 (Concrete and Unsuitable Soils) | $60,325 |
| 089 | Undercutting at NE Corner of Building in Road | in PCO 047 |
| 093.2 | Davis Bacon Wage Rate - First Choice Masonry | $132,063 |
| 096 | Settlement Plates/Poles | $8,636 |
| 099 | Undercut Unsuitable Soil East side of Creek | in PCO 047 |
| 102 | Undercut Soils at area B (2 Locations) | in PCO 047 |
| 103 | RFI 076 Change to Outfall 5 and 6 | $10,899 |
| 104 | Extra Work at Bridge Foundations | $46,420 |
| 117 | Undercut UST Vaults (VA#2) | in PCO 047 |
| 119 | Emergency Temp Bridge Repairs | $11,007 |
| 120 | Muck Out & Undercut Gas Vault | in PCO 047 |
| 121 | ASI 005 Waterline Changes | $7,179 |
| 126 | Undercut North Side Fueling Canopy | in PCO 047 |
| 127 | Door and Hardware Change | $39,361 |
| 129 | Structure 47 Washington Gas Conflict | $5,203 |

24

| PCO Number | Description | Claimed Amount |
|---|---|---|
| 135 | Additional Shotcrete due to Property Inconsistency | $29,782 |
| 137 | Additional WMATA Field Office | $22,781 |
| 139 | Undercut Unsuitable Soil/Debris-NW Site-Parking/C&G | in PCO 047 |
| 146 | Undercut at Bus Wash Exit Pavement and South Property Curbline | in PCO 047 |
| 150 | Additional Staff | $534,901 |
| 152 | Undercut between Bridge & Guard Booth (Access Road) | in PCO 047 |
| 156 | Undercut South side of Lot East of F&W | in PCO 047 |
| 158 | Resultant Impacts of Undercuts and Unforeseen Conditions | $116,238 |
| 159 | Fire Sprinkler FM Impacts | $246,708 |
| 161 | Fuel Island Canopy Deletion | $17,026 |
| 171 | Undercut South Side Near Old TCCO Trailer | in PCO 047 |
| 172 | Undercut MSE Wall - Southeast | in PCO 047 |
| 175 | Contaminated Soils & Undercut along Eastside of CBR | $36,451 |
| 179 | Paint Booth Buy America Bolts | $3,645 |
| 180.1 | Initial Tank Filling - Balance from Total CO Proposal | $47,853 |
| 183 | Fire Alarm FM Impacts and WMATA Directed Fire Alarm Changes | $110,429 |
| 191 | Flooring Changes | $11,202 |
| 196 | Developer and Project Close Out | $61,431 |
| 198 | ASI 021 Elevator 1 & 3 Mech Rev - A/C | $77,482 |
| 201 | Guard Booth Crosswalk & Parking ADA Compliance Site Re-Design | $49,185 |
| 207 | Fire Marshal Signage Add-Ons | $6,052 |
| 210 | Washington Gas Site Turnover Impact (Changed Site Conditions) | $124,296 |
| 213 | Utilities SCI Date Reconciliation | $1,144 |
| 216 | RFI 308 Lighting Control Changes | $5,965 |
| 217 | Core Drill for AVL-WIFI excluded | $9,471 |
| 218 | Contaminated Soils at Temp Entrance | $2,535 |
| 219 | Added County Work at Vegetative Channel/Creek | $2,464 |
| 222 | Allowance Markup Reconciliation | $255,152 |
| | | $3,052,322 |

## Count VII
## (Contract Balance)

140.    The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

141.    Turner has completed the Contract and is entitled to recover as its Contract balance $1,240,115.62.

142.    WMATA materially breached the Contract by failing to pay this balance to Turner.

4836-6154-1998.2

**WHEREFORE**, Turner requests this Court to enter judgment on its behalf as follows, plus

interests, and costs:

| Count I | $6,514,845.00 |
|---|---|
| Count II | $70,652.00 |
| Count III | $1,275,833.00 |
| Count IV | $2,858,038.00 |
| Count V | $556,275.00 |
| Count VI | $3,052,322.00 |
| Count VII | $1,240,115.62 |
| **TOTAL** | **$15,460,009.62** |

Date:   August 24, 2018                    Respectfully submitted,


                                           */s/ Amy E. Garber*
                                           Douglas L. Patin (VA Bar No. 20324)
                                           Thomas R. Lynch (VA Bar No. 73158)
                                           Amy E. Garber, Esq. (VA Bar No. 83098)
                                           BRADLEY ARANT BOULT CUMMINGS LLP
                                           1615 L Street, N.W., Suite 1350
                                           Washington, DC 20036
                                           Telephone:     (202) 719-8241
                                           Facsimile:     (202) 719-8341
                                           Email:         dpatin@bradley.com
                                                          tlynch@bradley.com
                                                          agarber@bradley.com

                                           *Counsel for Plaintiff/Counterclaim Defendant*
                                           *Turner Construction Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2018, I electronically filed the forgoing with the Clerk of Court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following:

Attison L. Barnes, III
Christopher M. Mills
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
abarnes@wileyrein.com

*Counsel for Defendant/Counterclaim Plaintiff/Third-Party Plaintiff*
*Washington Metropolitan Area Transit Authority*

William B. Porter
Kevin F.X. De Turris
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
wporter@bklawva.com
kdeturris@bklawva.com

Charles Wayne Malcomb II (*pro hac vice*)
Benjamin Mariano Zuffranieri, Jr. (*pro hac vice*)
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
*CMalcomb@hodgsonruss.com*
*bzuffranieri@hodgsonruss.com*

*Counsel for Third-Party Defendant*
*Iskalo CBR LLC*

*/s/ Amy E. Garber*
Amy E. Garber

27